RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0188p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

THE J.M. SMUCKER COMPANY,

        *Plaintiff-Appellee*,

   *v.*

ACE AMERICAN INSURANCE COMPANY,

        *Defendant-Appellant*.

No. 25-3799

─────────────

Appeal from the United States District Court for the Northern District of Ohio at Akron.
No. 5:23-cv-00607—John R. Adams, District Judge.

Argued: April 23, 2026

Decided and Filed: July 1, 2026

Before: SILER, MOORE, and BLOOMEKATZ, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Christopher A. Wadley, WALKER WILCOX MATOUSEK LLP, Chicago, Illinois, for Appellant. Jonathan M. Cohen, K&L GATES LLP, Washington, D.C., for Appellee. **ON BRIEF:** Christopher A. Wadley, WALKER WILCOX MATOUSEK LLP, Chicago, Illinois, for Appellant. Jonathan M. Cohen, Erin D. Fleury, Patrick Maley, K&L GATES LLP, Washington, D.C., K. James Sullivan, Matthew A. Chiricosta, Fritz E. Berckmueller, CALFEE, HALTER & GRISWOLD, Cleveland, Ohio, for Appellee.

─────────────

## OPINION

─────────────

SILER, Circuit Judge. The J.M. Smucker Company ("Smucker") brought an action against its insurer Ace American Insurance Company ("ACE"), alleging breach of contract and seeking a declaratory judgment. Specifically, the parties disagreed whether there was one

"occurrence" or many occurrences for purposes of determining the number of retained limits under its insurance policies. On summary judgment, the district court agreed with Smucker. Because the insurance policies' definition of occurrence and the Ohio "cause" test dictate that there is one occurrence in this case, we **AFFIRM**.

## I. Background

Smucker makes food products, including peanut butter. To protect itself from liability, Smucker purchased year-long commercial general liability insurance policies from ACE, one in 2021 and another in 2022. Among other things, these policies provide financial protection against bodily injuries that result from bacterial contamination. Each policy stipulates a retained limit of $250,000 per "occurrence." In other words, Smucker must pay defense costs and liabilities up to $250,000 before ACE has an obligation to pay. The policies define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

In 2022, Smucker recalled certain peanut butter products produced in its Lexington, Kentucky facility due to potential salmonella contamination. Based on allegations of contamination, consumers brought thousands of claims against Smucker, alleging bodily injury and property damage.

Smucker sent notice of the relevant claims to ACE. But ACE denied Smucker's coverage request. Explaining its position, ACE stated that each individual claimant's exposure to salmonella-contaminated peanut butter constituted a separate single occurrence. ACE then stated that the Lot Endorsement in the insurance policies aggregated these thousands of occurrences into 225 occurrences organized by "lot" (a 24-hour period of peanut butter production). ACE concluded that, for each of the 225 occurrences, Smucker had to reach the $250,000 retainer limit before triggering ACE's payment obligations. As relevant, the Lot Endorsement states the following:

Any "bodily injury" or "property damage" that

    A. Is included in the "products-completed operations hazard";

    B. Arises from the substantially same general harmful condition, cause, defect, error or suspected deficiency; and

    C. Arises out of any one "lot" of "your product" that is prepared or acquired by you;

shall be considered as a single "occurrence". Such "occurrence" shall be deemed to occur when the "bodily injury" or "property damage" occurs for the first claim arising from such "lot."

For the purpose of this endorsement, a "lot" means all goods or products prepared or acquired;

    A. During the time frame that is the normal amount of time for a single "lot" in accordance with the insured's customary procedures; and

    B. At a single production facility; and

    C. Prepared in accordance with the insured's customary production and quality control "lot" identification procedures.

All other terms, conditions and exclusions remain unchanged.

Ultimately, ACE's reading of the policies meant that Smucker might need to pay up to $56,250,000 for each of the two applicable insurance policies—totaling $112,500,000 in retained limits—before ACE would be obligated to pay.

Unsatisfied with ACE's policy interpretation, Smucker filed a complaint in federal district court against ACE, alleging breach of contract and requesting a declaration that the relevant claims against Smucker arose from a single occurrence. ACE later filed a counterclaim seeking a declaration that Smucker must pay the $250,000 retained limit for each of the 225 production lots before ACE's coverage kicked in for each lot.

Later, the parties cross-moved for summary judgment to determine the number-of-occurrences question. The district court granted Smucker's motion and denied ACE's motion, reasoning that salmonella contamination was the lone occurrence and that the Lot Endorsement was ambiguous. ACE moved to certify for interlocutory appeal the district court's order on summary judgment and to stay the case pending appeal. The district court granted the motion to certify and stay. This appeal followed.

## II.  Standard of Review

We review de novo a district court's grant of summary judgment.  *Nash v. Bryce*, 157 F.4th 436, 443 (6th Cir. 2025).

## III.  Discussion

Smucker contends that the language of the insurance policies and Ohio's "cause" test necessitate finding that the alleged salmonella outbreak is the lone occurrence in this case and that the Lot Endorsement does not convert one occurrence into many.  In contrast, ACE relies on product liability cases to argue that each claimant's exposure to salmonella is a separate occurrence and that the Lot Endorsement bundles these thousands of occurrences into 225 lots.

### A.     The policies' definition of occurrence suggests that salmonella contamination is the only occurrence.

To support its position, Smucker first argues that the insurance policies' definition of "occurrence" demonstrates that the salmonella contamination is the lone occurrence.  ACE offers its own interpretation of occurrence and attempts to distinguish Smucker's preferred caselaw.

As relevant, the two insurance policies define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  What is the "accident" in this case?  Because the policies do not define the meaning of accident, we may rely on its ordinary meaning.  *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995).  And we have elsewhere defined an accident as "[s]omething that happens by chance or without expectation; an event that is without apparent or deliberate cause."  *Scott Fetzer Co. v. Zurich Am. Ins. Co.*, 769 F. App'x 322, 328 (6th Cir. 2019) (quoting Oxford English Dictionary (3d ed. 2011)).  Also important, under Ohio law (which governs here), the accident is considered from the insured's point of view.  *See id.*; *see also Parker Hannifin Corp. v. Steadfast Ins. Co.*, 445 F. Supp. 2d 827, 832 (N.D. Ohio 2006) (finding that malfunctioning gaskets were the single occurrence that gave rise to damages for numerous TV users).  In other words, Ohio law dictates that we examine what the insured did unintentionally that exposed it to liability.  *See Parker Hannifin*, 445 F. Supp. 2d at 832.

On this point, Smucker's only identifiable accident is the alleged salmonella outbreak which led to the production of potentially contaminated peanut butter. Indeed, producing contaminated peanut butter was both unintentional and the conduct that eventually gave rise to the actions against Smucker. *See id.* By contrast, each claimant's consumption of peanut butter was not an accident, and it was not Smucker's conduct. So, each claimant's peanut butter consumption cannot determine the number of occurrences.

The rest of the occurrence definition further confirms that the alleged salmonella outbreak is the lone occurrence. The definition includes "continuous or repeated exposure to substantially the same general harmful conditions." Again, viewing the issue from Smucker's perspective (what it did to incur liability), Smucker's alleged production errors exposed the claimants to "the same general harmful condition[]": salmonella contamination. The contamination was a single, continuous accident.

The *Scott Fetzer* case supports our definitional analysis. In *Scott Fetzer*, three women sued the insured plaintiff based on sexual assaults committed by an independent dealer of the insured plaintiff's products. *Id.* at 323–24. Subsequently, the insured plaintiff turned to its insurer for reimbursement after settling the victims' claims. *Id.* at 324. On appeal, the court addressed whether the negligent hiring and supervision of the independent dealer who committed the assaults was the operative occurrence or whether the actions taken against the women were the occurrences. *Id.* at 324–25.

Relying on a similar definition of "occurrence," this court found that it was reasonable to interpret the word "accident" as encompassing the negligent supervision of the independent dealer. *Id.* at 327. Indeed, the intentional acts of the independent dealer could not be the operative accident because they were not the insured's actions and they were not accidental. *Id.* at 327–28.

In short, *Scott Fetzer* mirrors our reasoning and confirms that the "accident" here is Smucker's unintentionally producing contaminated peanut butter rather than the claimants' intentional consuming of peanut butter. *See id. Scott Fetzer* also confirms that we must view the

exposure from the insured's perspective, and Smucker exposed the claimants to one thing—accidental salmonella contamination.  *See id.*

ACE attempts to distinguish *Scott Fetzer*, noting that the *Scott Fetzer* court first found that the definition of occurrence was ambiguous.  But ambiguity is a problem for ACE because ambiguous provisions are construed in favor of the insured party.  *See Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1262 (Ohio 2003).  So, even assuming the contract was ambiguous, that ambiguity favors Smucker.

**B.      Ohio's cause test corroborates that salmonella contamination is the only occurrence.**

Next, Smucker argues that Ohio's cause test itself supports Smucker's position.  ACE argues the contrary by relying on product liability cases where the parties contested insurance coverage.  Once again, we agree with Smucker.

When confronted with a number-of-occurrences question, Ohio courts employ the cause test.  *Scott Fetzer*, 769 F. App'x at 328.  Under that test, "the number of occurrences is determined by reference to the cause or causes of the damage or injury, rather than by the number of individual claims."  *Cincinnati Ins. Co. v. ACE INA Holdings, Inc.*, 886 N.E.2d 876, 885 (Ohio Ct. App. 2007).  Additionally, "where there is but one proximate, uninterrupted and continuous cause, all injuries and damages are included within the scope of that single proximate cause."  *Progressive Preferred Ins. Co. v. Derby*, No. F-01-002, 2001 WL 672177, at *3 (Ohio Ct. App. 2001).

By viewing each claimant's exposure to contaminated peanut butter as an occurrence, ACE's perspective makes the number of occurrences and claims identical.  Stated differently, ACE asks us to view the claims as the occurrences, and the cause test does not permit this outcome.  *See Cincinnati Ins. Co.*, 886 N.E.2d at 885 (stating that the cause of the injuries is the occurrence rather than "the number of individuals claims.").

But ACE still insists that "each claimant's injurious exposure to [s]almonella-contaminated peanut butter qualifies as a separate occurrence."  To make this point, ACE cites

multiple cases but relies primarily on *LuK Clutch Sys., LLC v. Century Indem. Co.*, 805 F. Supp. 2d 370 (N.D. Ohio 2011).

Applying Ohio law, *LuK Clutch* addressed a question of the scope of insurance coverage rather than retained limits. *Id.* at 380. Indeed, the *LuK Clutch* court partially distinguished the coverage issue before it from a retained limits case—*Parker Hannifin*—based on this difference. *Id.* Regardless, the *LuK Clutch* court rejected the argument that the business decision to produce products containing asbestos was the occurrence that triggered insurance coverage. *Id.* at 378. On this point, the court emphasized that the occurrence giving rise to coverage had to occur during the policy period, and the decision to make products with asbestos occurred outside the policy period. *Id.*

Here, neither party stakes its claim on a business decision occurring outside the applicable policy period. The parties agree on the core cause of the injuries, but they disagree on whether—in determining the number of retained limits—the number of occurrences is the same as the number of batched claims. And, unlike in *LuK Clutch*, the parties agree that any alleged salmonella outbreak was accidental, not the result of a purposeful business decision. Furthermore, it does not follow, as ACE implicitly contends by relying on *LuK Clutch*, that the occurrences that trigger coverage are necessarily the same as the occurrences that determine the number of retained limits. For these reasons, *LuK Clutch* is too different to provide guidance.

ACE's other cases involving asbestos-related disputes suffer the same problem as *LuK Clutch*. In *Westfield Ins. Co. v. Cont'l Ins. Co.*, the court addressed the number of occurrences for purposes of determining insurance coverage after a business decision to distribute products containing asbestos. No. 1:13CV02367, 2015 WL 1549277, at *3 (N.D. Ohio Apr. 7, 2015) (observing that "Continental contends that MVS asbestos claims arise out of a single occurrence, namely, MVS' decision to distribute asbestos-containing products"); *see also William Powell Co. v. OneBeacon Ins. Co.*, 75 N.E.3d 909, 914–16 (Ohio Ct. App. 2016) (addressing largely the same issues and arguments as in *Westfield*). So, these cases do not aid ACE.

**C.    The Lot Endorsement is ambiguous, so it does not override the definition of occurrence here.**

Smucker next contends that the Lot Endorsement is, at best, ambiguous and thus should not override the definition of occurrence in the policies. In contrast, ACE contends that the Lot Endorsement serves to aggregate thousands of occurrences by lot and that Smucker's understanding of occurrence and the Lot Endorsement would render the Lot Endorsement meaningless.

"Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation." *Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008). And because the insurer customarily drafts the insurance contract, any ambiguity in an insurance contract is generally construed against the insurer and in favor of the insured. *Galatis*, 797 N.E.2d at 1262.

In relevant part, the Lot Endorsement states the following:

Any "bodily injury" or "property damage" that

    A. Is included in the "products-completed operations hazard";

    B. Arises from the substantially same general harmful condition, cause, defect, error or suspected deficiency; and

    C. Arises out of any one "lot" of "your product" that is prepared or acquired by you;

shall be considered as a single "occurrence". Such "occurrence" shall be deemed to occur when the "bodily injury" or "property damage" occurs for the first claim arising from such "lot."

Here, the Lot Endorsement is subject to more than one interpretation. First, the provision is equivocal on whether it redefines "occurrence." The Lot Endorsement does not specify that it is replacing the definition of "occurrence," and other endorsements expressly state that they do replace a policy definition. Because the Lot Endorsement is unclear whether it creates a new definition, that already suggests ambiguity.

But the problem goes deeper. The phrase "[a]rises out of any one 'lot'" could be a phrase of limitation, indicating that multiple injuries caused by the same condition within one lot are still one occurrence. On the other hand, as ACE contends, the phrase "[a]rises out of any one

'lot'" could suggest that injuries caused by the same condition are aggregated on a per-lot basis when there are multiple defective lots.  Both readings are plausible because the operation of the endorsement on claims arising out of "any one 'lot'" does not speak to its effect on claims arising from the same general harmful conditions, but multiple lots.  At best, therefore, the phrase is ambiguous.

Supporting this conclusion, Smucker relies on the case of *ConAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62 (Del. 2011).  In that case, the Supreme Court of Delaware faced a remarkably similar situation: salmonella-contaminated peanut butter, a definition of occurrence, and a lot endorsement potentially affecting the number of retained limits.  *Id.* at 65–66.  Further, the language of occurrence and the Lot Endorsement were in all material respects similar to the provisions here.  *See id.* at 65.

The Delaware court emphasized that both proposed interpretations were reasonable:

> [O]ne reasonably may interpret the Lot or Batch Provision as segmenting, for insurance coverage purposes, claims into separate seven day periods. . . .  On the other hand, one also reasonably could interpret the Lot or Batch Provision as expanding coverage.  Under that interpretation, the Lot or Batch Provision would operate to convert multiple claims in one lot or batch into a single Occurrence[.]

*Id.* at 69–70.  Because the *ConAgra* court determined that the Lot Endorsement was reasonably subject to more than one interpretation, it concluded that the provision was ambiguous.  *Id.* at 73.  And here we find the same.

In response, ACE argues that *ConAgra* is not dispositive because there is a surplusage issue here that was not present before the Delaware court.  The *ConAgra* endorsement stated that all injuries or damage "arising out of one lot or batch" would be considered one occurrence.  *Id.* at 65.  Here, the Lot Endorsement additionally requires that any injuries arise from "substantially the same general harm condition[.]"  This additional language matters because it suggests that the Lot Endorsement mirrors what already happens under Smucker's interpretation of occurrence.  If the Lot Endorsement is an exact mirror, then it is redundant and therefore superfluous.  *Cf. Am. Eagle Invs., Inc. v. Marco's Franchising, LLC*, 250 N.E.3d 677, 688 (Ohio Ct. App. 2024) (stating that a court must avoid any interpretation that would render contract terms or provisions meaningless).

There are problems with this argument, however. For one, no part of a contract should be found superfluous "unless that is manifestly required[.]" *Sullivan-White v. Aukland*, 205 N.E.3d 1147, 1158 (Ohio Ct. App. 2023). So, ACE is tasked with proving a negative—that no non-superfluous reading of the provision is possible. *See id.* That is a high burden.

Smucker proposes a couple of theories that plausibly defeat the surplusage argument. For instance, Smucker suggests that the Lot Endorsement has a "timing function." Specifically, the Lot Endorsement states that an "'occurrence' shall be deemed to occur when the 'bodily injury' or 'property damage' occurs for the first claim arising from such 'lot.'" Thus, it seems that an occurrence is restricted to a single policy year when multiple injuries arise from a single lot and continue to crop up during later policy periods. And so, even when injuries arise from a single lot across multiple policy periods, this timing function means Smucker would only need to pay the retained limit for one year, rather than for multiple years.

Ultimately, the canon against surplusage requires that we ask whether there is *any* scenario where the Lot Endorsement might operate, and by illustrating the timing function of the Lot Endorsement, Smucker has done just that. At bottom, Smucker has met the relatively low burden of showing that the Lot Endorsement is not "entirely redundant." *Kungys v. United States*, 485 U.S. 759, 778 (1988).

Finally, ACE relies on *London Market Insurers v. Superior Ct.*, 53 Cal. Rptr. 3d 154 (Cal. Ct. App. 2007), to establish that the Lot Endorsement must aggregate individual exposures by lot. We note that the court in *London Market* stated in a footnote that it "believe[d] that the clause is ambiguous as applied to the facts of this case." *Id.* at 171 n.8. Although ambiguity did not determine the outcome in *London Market*, it does here. So, *London Market* does not ultimately help ACE.

## IV. Conclusion

For the reasons above, we **AFFIRM** the judgment of the district court in favor of the insured, Smucker.